IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| CAESAR R. CAMPBELL; *fdba* | § | CASE NO: 06-31321 |
| CAESAR'S LANDSCAPING, *et al*; | § | |
| PAMELA A. CAMPBELL | § | |
|     Debtors. | § | |
| | § | CHAPTER  13 |
| | § | |
| CAESAR R. CAMPBELL, *et al* | § | |
|     Plaintiffs, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3476 |
| | § | |
| COUNTRYWIDE HOME LOANS, INC. | § | |
|     Defendant. | § | |

### SECOND AMENDED MEMORANDUM OPINION

On February 7, 2007, Countrywide filed a motion to reconsider the Court's January 26, 2007 order granting in part the Plaintiffs' motion for summary judgment.  The motion alleges that the Court erred when it found that the alleged pre-petition escrow shortage in the amount of $3,543.78 included past-due escrow amounts that were to be applied to the Debtors' 2006 property tax obligation.  After further review, the Court concludes that the shortage of $3,543.78 did not include any amounts calculated to reimburse Countrywide for payment of the 2006 property taxes.

Accordingly, the Court now amends its prior memorandum opinion.  Nevertheless, this correction does not alter the fact that Countrywide willfully violated the stay when it required the Debtors' post-petition monthly mortgage escrow payment to include an amount to pay the Debtors' 2006 property taxes, a pre-petition debt.  The balance of the disputed matters will be considered at trial.

## Background

On October 23, 2002, Caesar Campbell, Sr. executed a Texas Home Equity Note (the "Note") payable to Aames Funding Corp. in the principal amount of $72,800.00.  On that same day, Caesar Campbell and Pamela Campbell executed a Texas Home Equity Security Instrument (the "Security Instrument") (collectively with the Note, the "Loan Documents") granting Aames a security interest in the Debtors' homestead located at 7131 Buchanan, Richmond, Texas 77469 (the "Property") to secure Mr. Campbell's obligations pursuant to the Note.  Bankers Trust (AAMESMT02-2) currently owns the Note and Countrywide is the servicer of the loan.

As of February 2005, the Debtors' mortgage payment was $987.07 per month.  This amount included: (i) the monthly principal and interest payment of $620.13; (ii) a regular escrow contribution of $280.18; (ii) an escrow shortage contribution of $63.51; and (iv) a reserve allowed by the Real Estate Settlement Procedures Act ("RESPA") in the amount of $23.25.

On April 3, 2006, the Debtors filed a voluntary petition under chapter 13 of the Bankruptcy Code.  On April 10, 2006, Countrywide filed a proof of claim (the "Proof of Claim") in the Debtors' bankruptcy case.  The Proof of Claim lists a principal balance in the amount of $71,801.09 with an interest rate of 9.65%.  The Proof of Claim asserts arrearages in the amount of $16,348.32, comprised of:

    (i)      15 delinquent pre-petition monthly principal and interest payments totaling $9,301.95;
    (ii)    A pre-petition escrow shortage in the amount of $3,543.78;
    (iii)   Pre-petition inspection fees in the amount of $239.00;
    (iv)   "Uncoll. Late Charges" in the amount of $152.40;
    (v)    Pre-petition attorneys fees in the amount of $2,937.97; and
    (vi)   Post-petition attorneys fees in the amount of $200.00.

The Proof of Claim lists the regular monthly payment amount as $1,047.35 and conspicuously states the following in bold type:

The post petition payment for this loan is $1,047.35. Effective 6/1/2006 the post petition payment will increase to $1,124.97. Only the principal and interest payments are reflected in the arrearage on debt subtotal below; any escrow claim through the petition date is separately stated on the claim detail listed below.

On June 26, 2006, the day prior to the Debtors' scheduled confirmation hearing, the Debtors filed an objection to the Proof of Claim. The Debtors object to the inclusion of the inspection fees, post-petition attorneys fees and increased post-petition monthly mortgage payments. The Debtors highlighted the fact that the Proof of Claim total amount includes $3,543.78 for the pre-petition escrow shortage but also states conspicuously that Countrywide plans to increase the monthly mortgage payment to recover an escrow shortage.

On June 27, 2006, the Court entered an order confirming the Debtors' chapter 13 plan (the "Plan"). The Plan provided for monthly mortgage payments to Countrywide in the amount of $987.07 and pre-petition arrearages payable to Countrywide in the amount of $16,348.32.

On July 20, 2006, the Debtors commenced this action, seeking damages pursuant to 11 U.S.C. § 362(k) for Countrywide's alleged violation of the automatic stay. The Debtors assert that Countrywide is attempting to collect a pre-petition debt, the 2006 property taxes, by increasing the Debtors' post-petition mortgage payments. They contend that such act violates § 362(a)(1) and (3)-(6). The Debtors further argue that they are entitled to recover attorneys fees, costs and expenses based on the nature of this proceeding.

On July 25, 2006, the Court consolidated the Debtors' claim objection with this adversary proceeding.

On October 31, 2006, the Debtors filed a motion for summary judgment. Countrywide objects to the requested relief.

## Summary Judgment Standard

A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact. *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006); *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 562 (5th Cir. 2005). Material facts are those that could affect the outcome of the action or could allow a reasonable fact finder to find in favor of the non-moving party. *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005).

The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial. At all times, a court views the facts in the light most favorable to the non-moving party. *Rodriguez v. ConAgra Grocery Products, Co.*, 436 F.3d 468, 473 (5th Cir. 2006). However, to weigh evidence would result in a credibility determination which is not part of the summary judgment analysis. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 762 (5th Cir. 2001); *See MAN Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478 (5th Cir. 2006)**.** A court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).

If the movant bears the burden of proof, a successful motion must present evidence that would entitle the movant to judgment at trial. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003); *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine issue of material fact. *Warfield*, 436 F.3d at 557. The non-moving party has a duty to respond with specific evidence demonstrating a triable issue of fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 402 (5th Cir. 2005). When identifying specific evidence in the record, the non-movant must articulate how that evidence supports its

position.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301

(5th Cir. 2004).

### Analysis

Section 362 of the Bankruptcy Code provides that the filing of a bankruptcy petition

operates as a stay, applicable to all entities.  11 U.S.C. § 362(a).  The automatic stay prevents

creditors from scrambling to collect a debtor's limited assets while providing a debtor breathing

room so that an equitable disbursement of the debtor's assets may be made to creditors.  *In re*

*Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005).  In relevant part, the automatic stay prohibits:

> (1) the commencement or continuation, including the issuance or employment of
> process, of a judicial, administrative, or other action or proceeding against the
> debtor that was or could have been commenced before the commencement of
> the case under this title, or to recover a claim against the debtor that arose
> before the commencement of the case under this title;
> …
> (3) any act to obtain possession of property of the estate or of property from the
> estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to
> the extent that such lien secures a claim that arose before the commencement
> of the case under this title;
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose
> before the commencement of the case under this title;

11 U.S.C. § 362(a).

The Debtors maintain that their 2006 property tax obligation arose pre-petition.  By

raising the Debtors' mortgage payment post-petition to collect amounts related to these taxes, the

Debtors allege that Countrywide acted to collect a pre-petition debt in violation of the automatic

stay.  Countrywide does not dispute that it increased the monthly mortgage payment to account

for the Debtors' 2006 property taxes.  However, Countrywide argues that the debt did not arise

as between the Debtors and Countrywide until the taxes became due and payable upon receipt of the tax bill post-petition and the Debtors had a negative escrow balance.  Because the taxes were not assessed until after the Debtors' bankruptcy petition was filed, Countrywide argues the taxes arose post-petition.  Essentially, Countrywide argues that because it paid the tax claim post-petition, it should be treated either as a post-petition obligation or as an administrative expense. *See* 11 U.S.C. § 503(b)(1)(B).

The Debtors, as the party seeking damages for willful stay violations, bear the burden of proving that a stay violation occurred and that damages were suffered.  *See*, *e.g.*, *In re McCarthy*, 350 B.R. 820, 826 (N.D. Ind. 2006).  Section 362(k) governs willful stay violations.  11 U.S.C. § 362(k).  To recover on a claim under § 362(k), the Debtors must establish that: (1) the defendant knew of the existence of the stay; (2) the defendant's acts were intentional; and (3) these acts violated the stay.  *In re Chesnut*, 422 F.3d at 302.  Because the core of the parties' dispute surrounds whether Countrywide violated the stay, the Court will begin its analysis with this issue.

### 1.  Did Countrywide violate the automatic stay?

Upon the filing of a bankruptcy petition, the automatic stay acts as a "self-executing injunction."  *See*, *e.g.*, *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) (citing *Gruntz v. County of Los Angeles*, 202 F.3d 1074, 1082 (9th Cir. 2000)).  The automatic stay has broad application and acts to restrain creditors from taking any action to continue collection efforts against the debtor or property of the estate.  11 U.S.C. § 362(a); *In re Chesnut*, 422 F.3d at 303.  The stay, however, does not operate to stay proceedings or claims that arise post-petition unless the creditor seeks to enforce such claims against property of the estate. 11 U.S.C. § 362(a); 3 COLLIER ON BANKRUPTCY ¶ 362.03[3][c] (15th ed. rev. 2006) (citing

*Bellini Imports LTD v. Mason & Dixon Lines, Inc.*, 944 F.2d 199, 201 (4th Cir. 1991)).
Consequently, it is necessary to determine whether the Debtors' obligation to Countrywide for
payment of the property taxes arose pre-petition or post-petition.

### a. The Debtors' tax obligation

State law controls when a claim based upon a tax obligation arises. *In re Midland Indus.
Serv. Corp.*, 35 F.3d 164, 166 (5th Cir. 1994). Texas law provides that "[o]n January 1 of each
year, a tax lien attaches to property to secure the payment of all taxes, penalties, and interest
ultimately imposed for the year on the property…." TEX. TAX CODE § 32.01(a). The owner of
the property as of January 1 is personally obligated for the payment of all taxes ultimately
imposed for the year, even if he subsequently conveys the property. *Id.* at § 32.07. The taxes,
however, are generally not assessed until approximately October 1 of that year. *In re Midland
Indus. Serv. Corp.*, 35 F.3d at 166.

Whether a debt arises pre-petition or post-petition is determined by when the debt
accrued, not when a demand for payment or an action on the debt was brought. *In re Luongo*,
259 F.3d 323, 334 (5th Cir. 2001).

In *In re Midland Industrial Service Corporation*, the Fifth Circuit analyzed Texas law to
determine when a debtor's obligation to the local taxing authority accrued. The local taxing
authority sought to have its claim allowed under § 503(b)(1)(B)(i) as an administrative expense
claim payable by the bankruptcy estate.[1] Section 507(a) provides that certain expenses and
claims shall have priority, including administrative expenses allowed under § 503(b). Although

---

[1] The main issue in the present case concerns whether the taxes should be paid pursuant to § 1322(b)(2) rather than
§ 503(b)(1)(B)(i). However, the two means produce the same end. In *Midland*, the Fifth Circuit did not mandate
that the pre-petition claim be paid in full in accordance with applicable non-bankruptcy law. Countrywide's position
is that § 1322(b)(2) produces an outcome that mandates that the pre-petition taxes be paid in full in accordance with
applicable non-bankruptcy law. Although the issue in this case is decided under a different statutory provision than
*Midland*, the outcome is identical to the outcome in *Midland.*

Texas law provides that a tax lien arises on January 1 of the year for which the tax is imposed, the taxing authority argued that the tax was incurred on the date it was assessed. Because the taxes were assessed post-petition, the taxing authority argued that they were payable as expenses of the estate and therefore payable as a priority claim under § 507(a)(2).

The Fifth Circuit held that a tax obligation accrues when the event that triggers liability has occurred. *In re Midland Indus. Serv. Corp.*, 35 F.3d at 167. Because a property owner's liability for taxes for any given year arises as of January 1 of that year regardless of when the tax is assessed, a debtor's obligation to pay such taxes accrues on January 1. *Id.* The Court held that the taxes were not an administrative expense because the events which triggered the tax liability—ownership of the property and attachment of the tax lien—occurred pre-petition. *Id.* The Fifth Circuit's ruling clarifies that a claim for property taxes for the year in which a debtor's petition is filed arises on January 1 of that year and is therefore a pre-petition claim even if the assessment of such taxes occurs post-petition or payment of the taxes is not yet due.

In the present case, the Debtors filed their bankruptcy petition on April 3, 2006. Although the 2006 property taxes had not yet been assessed, the Debtors' liability for such taxes accrued on January 1, 2006. Thus, the Debtors' liability for their 2006 property taxes is a pre-petition debt.

### b. The Debtors' liability to Countrywide for property taxes

Countrywide does not dispute that the Debtors' obligation to pay the local taxing authority arose pre-petition. Instead, Countrywide asserts that as between itself and the Debtors, the debt arose post-petition when Countrywide increased the Debtors' monthly mortgage payments to account for future escrow transactions in accordance with the Loan Documents. Specifically, Countrywide argues that no claim arose in its favor until it paid the taxes and an

escrow shortage accrued.  Because the 2006 property taxes did not become due until post-petition, Countrywide maintains that it did not attempt to collect a pre-petition debt and thereby violate the automatic stay.

Countrywide relies on its rights pursuant to paragraph 9 in the Security Instrument to support its position.  Paragraph 9 of the Security Instrument provides, in relevant part:

> If [] Borrower fails to perform the covenants and agreements contained in this Security Instrument [or] there is a legal proceeding that might significantly affect [Countrywide's] interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy…) … then [Countrywide] may do and pay for whatever is reasonable or appropriate to protect [Countrywide's] interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  [Countrywide's] actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding….   Although [Countrywide] may take action under this Section 9, [Countrywide] does not have to do so and is not under any duty or obligation to do so.
>
> Any amounts disbursed by [Countrywide] under Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from [Countrywide] to Borrower requesting payment.

Upon the Debtors' failure to perform under the Security Instrument, this language authorizes Countrywide to pay the local taxing authority's claim for property taxes since a tax lien attaches to the Property on January 1 of each year and the tax lien has priority over Countrywide's interest in the Property.  TEX. TAX CODE § 32.05(b); *ABN AMRO Mortgage Group v. TCB Farm & Ranch Land*, 200 S.W.3d 774, 779 (Tex. App.—Forth Worth 2006, no pet. h.).  If Countrywide exercises this option and pays the tax claim, the Debtors become further indebted to Countrywide for such amount in accordance with the terms of the Security Instrument.  As a result, Countrywide argues that it had no claim against the Debtors based upon

its payment of the 2006 property taxes until Countrywide received a tax statement or bill and was aware that an escrow shortage accrued.  Because Countrywide paid the 2006 property taxes post-petition when assessed and due, it alleges that its claim against the Debtors for payment of the taxes arose post-petition, and therefore Countrywide's collection efforts did not violate the stay.  Essentially, Countrywide contends that a creditor secured by a junior lien on real property can make a post-petition payment on the claim of the senior lien-holder and thereby receive priority treatment in bankruptcy, something the senior lien holder could not otherwise do.

Countrywide's argument fails for two reasons.  First, to the extent that Countrywide's rights against the Debtors arise from its payment of a debt owed by the Debtors to a third party (i.e., the taxing authorities), Countrywide can have no greater rights than those of the taxing authority.  Second, Countrywide's contractual right against the Debtors arose pre-petition in accordance with the terms of the Security Instrument, not post-petition when the taxes became due.

The Debtors' obligation to pay their 2006 property tax debt to the local taxing authority arose on January 1, 2006.  If the taxing authority had asserted a claim in the bankruptcy case for the 2006 property taxes, it would be treated as a pre-petition claim pursuant to *In re Midland Industrial Services Corp.*  To the extent that Countrywide argues it is entitled to assert a claim for payment of the 2006 tax debt against the Debtors based upon its payment of the debt on December 2, 2006, it is correct.  However, Countrywide may not acquire any greater rights against the Debtors than the taxing authority would have against the Debtors.[2]  The fact that Countrywide waited until after the bankruptcy petition was filed to satisfy the Debtors' obligation to the taxing authority does not affect the nature of the debt.  The argument that the

---

[2]  The Court analyzes Countrywide's contractual rights below.  This reference is merely to Countrywide's common law or statutory right of subrogation.

payment of the 2006 property taxes should be treated as an administrative expense entitled to priority pursuant to §§ 503(b)(1)(B) and 507(a)(2) similarly fails.  Section 503(b)(1)(B) only allows as an administrative expense "any tax incurred by the estate."  In this case, Countrywide paid the tax.  The estate did not incur the tax to the taxing authorities because it was incurred pre-petition by the Debtors.

Contractually, the Security Instrument requires that the Debtors pay all property taxes. However, the Security Instrument further requires that the Debtors pay amounts due for property taxes to Countrywide as future escrow items throughout the 12-month period preceding the month in which the property taxes are due.[3]  Such payments must be made concurrently with the principal and interest payments due to Countrywide each month.   Specifically, paragraph 4 provides, in relevant part:

> Charges; Liens.  Borrower shall pay all taxes … attributable to the Property which can attain priority over this Security Instrument…. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.
> Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower … agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to [Countrywide], but only so long as Borrower is performing such agreement….

Paragraph 3 provides, in relevant part:

> Funds for Escrow Items.  Borrower shall pay to [Countrywide] on the day Periodic Payments[4] are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for … taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property….  These items are called "Escrow Items."

---

[3] The Court need not address whether the outcome would be the same if the agreements were as Countrywide alleges.  Accordingly, the Court expresses no view on the outcome of a situation where the lender *could not* have collected the amounts from the debtors pre-petition.  That matter is reserved for a future controversy.

[4] The Security Instrument defines Periodic Payment as "the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument."

11

Paragraph 1 further provides that "Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3."

Read together, the terms of the Security Instrument provide that the Debtors are obligated to pay the property taxes and that the Debtors fulfill this obligation by making required monthly escrow contribution payments to Countrywide for the estimated property taxes in advance of the date the property taxes are due.

The amount of the required escrow funds is determined in accordance with Paragraph 3 of the Security Instrument which provides that Countrywide "shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items" but such amounts may not "exceed the maximum amount a lender can require under RESPA."  As a result, Countrywide must estimate future property taxes and assessments, as well as insurance premiums, and allocate the estimated sum over a period sufficient to provide adequate Funds to pay the Escrow Items when due.  This right is limited by RESPA which proscribes lenders from requiring a borrower to deposit in any escrow account an aggregate sum which exceeds the amount sufficient to pay taxes, insurance premiums and other charges with respect to the property during the ensuing twelve-month period, plus one-sixth of the estimated total of such amounts.  12 U.S.C. § 2609(a).  This restriction, however, is subject to exception.  If the lender determines that a deficiency exists, the lender may require the borrower to make additional monthly deposits into the escrow account to remedy such deficiency but must notify the borrower of any shortage of funds.  *Id.* at § 2609(a)(2), (b).  Upon the borrower's payment of the escrow amounts, the Security Instrument requires Countrywide to hold the Funds in

accordance with RESPA and to apply the Funds to pay the Escrow Items when due, but no later than the time specified under RESPA.[5]

Consistent with the terms of the Security Instrument and the provisions of RESPA, a portion of the escrow items included in the Debtors' post-petition mortgage payment includes an amount representing a pre-petition contractual claim between Countrywide and the Debtors. Under the Loan Documents, the monthly escrow contribution due to Countrywide as part of the monthly mortgage payments due prior to April 3, 2006, each included an amount equal to 1/12 the estimated 2006 property taxes. The Debtors' failure to pay the monthly mortgage payment is a breach of the Security Instrument that triggers Countrywide's rights under paragraph 9. Thus, each time that the Debtors failed to make a monthly payment, Countrywide had a contractual claim against the Debtors for such amount. Countrywide's argument that it had no right against the Debtors until it paid the taxes on December 2, 2006, is inconsistent with its contractual rights.

The Court is mindful of the realities of the situation. The Security Instrument grants Countrywide a security interest in the Debtors' home. Although Countrywide holds a first lien against the Debtors' home, it is subordinate under Texas law to the property tax claims of various governmental units. Under Texas law, the lien that secures the property tax claims attaches on January 1 of each year. Controlling authority in this Circuit holds that the claim that is secured by the January 1 lien is a pre-petition claim under the Bankruptcy Code. *In re Midland Indus. Serv. Corp.*, 35 F.3d at 167. If the Debtors' property taxes are not paid by

---

[5] RESPA requires lenders to "make payments from the escrow account for such taxes … in a timely manner as such payments become due." 12 U.S.C. § 2605(g). Countrywide seems to rely on this provision to support its position that its claim could not arise against the Debtors until it paid the 2006 property taxes post-petition when due to the local taxing authority. For the reasons set forth in this opinion, this argument is flawed. In addition, Countrywide is not precluded from paying the Escrow Items prior to the time set forth in the Security Instrument. The Security Instrument simply states that Countrywide "shall apply the Funds to pay the Escrow Items *no later than* the time specified under RESPA" (emphasis added).

January 31 of the year following attachment, substantial interest and penalty accrues in favor of the governmental units.  Accordingly, it is common practice for holders of deeds of trust to pay the property taxes if the taxes are not timely paid by the borrower.

In this case, Countrywide paid property taxes that attached on January 1, 2006, by payment made on December 2, 2006.  Countrywide then adjusted the Debtors' required escrow deposit upward to account for the December 2006 property tax payment.  However, the 2006 property taxes were a pre-petition, secured claim.  Countrywide's Proof of Claim included an escrow deficiency in the amount of $3,543.78 that existed as of the petition date.  This escrow deficiency does not appear to include any amount attributable to the 2006 property taxes.

The Court will define two terms for the purpose of clarity.  First, the term "Escrow Deficit" is defined to be the cash balance in the Debtors' escrow account after accounting for all actual receipts and actual disbursements by Countrywide.  Second, the term "Contractual Escrow Shortage" is defined to be the theoretical cash balance in the escrow account if the Debtors had made all required deposits into the escrow account since the date of the Escrow Deficit arising after the payment of the 2005 property taxes paid in December 2005.

Countrywide represents that the Escrow Deficit as of the petition date was $3,543.78. For the purposes of summary judgment, that amount will be treated as accurate.

However, the Contractual Escrow Shortage as of the petition date was substantially greater.  The amount of the Contractual Escrow Shortage was $4,819.70.  This amount can be calculated in one of two ways (both methods producing the same result).  First, one can forecast the amount of disbursements for taxes and insurance that must be made and forecast all contractually required escrow deposits.  The shortfall, as documented by Countrywide, is $1,594.87.  In calculating the $1,594.87, Countrywide ignores the May 1, 2006 post-petition

escrow deposit of $318.98 that the Debtors were required to pay.  The $1,594.87 plus the $3,543.78 Escrow Deficit minus the missing $318.98 equals the $4,819.70.[6]  The second way to calculate the $4,819.70 is to examine the payments that were due to be made into the escrow account after the last tax disbursement.  Assuming that the last tax disbursement was made in December 2005 (the record is incomplete on this issue), there were four pre-petition escrow deposits due between December 2005 and April 3, 2006.  These total $1,275.92.  This amount plus the $3,543.78 equals $4,819.70.

To facilitate an understanding of the foregoing mathematician calculations, the Court attaches exhibits "A" and "B" to this memorandum.  Those exhibits demonstrate the calculation of the $4,819.70 in tabular format.

Even if the Debtors made all escrow payments from June 1, 2006 through December 1, 2006,[7] the Debtors' escrow balance would have totaled only $496.23[8] as of December 1, 2006. Accordingly, in order to pay the 2006 property taxes, Countrywide was required to advance $1,594.87 more than the balance in the escrow account.[9]

In calculating the 2007 mortgage payment, Countrywide believes that it should increase the escrow deposit in order to recover the $1,594.87 and that it is additionally entitled to a RESPA reserve adjustment of $52.95 to build up additional reserves.  If Countrywide had not

---

[6]  There is actually a three cent difference.  This is because the monthly escrow payment of $318.98 is rounded to the nearest penny.

[7]  Countrywide assumes that all payments were made.  Mortgage payments are made through the chapter 13 trustee. There are administrative delays in forwarding the payments to Countrywide.  It is possible that not all escrow payments were actually made.  Countrywide correctly assumes actual payment for the purpose of its escrow analysis.

[8]  The balance is quite low because in October, Countrywide paid $1,736.63 out of the escrow account for insurance on the home.

[9] This number reflects the Contractual Escrow Shortage ($4,819.70) minus the Escrow Deficit ($3,543.78) plus the escrow payment for May 1, 2006 ($318.98).

paid the extra $1,594.87, it acknowledges that it would not be entitled to an increase in the escrow deposit or the establishment of the additional reserves.

There are only two possible mechanisms identified by the Court under which Countrywide can recover the $1,594.87. First, as discussed above, the $1,594.87 can be treated as a subrogation claim under common law or under § 509 of the Bankruptcy Code. Without regard to whether Countrywide is entitled to subrogation, subrogation would only entitle Countrywide to step into the shoes of the governmental units. The imposition of an increased escrow payment on account of the hypothetically subrogated claim would plainly be an attempt to collect the governmental unit's pre-petition debt to which Countrywide was subrogated. That would violate § 362 of the Bankruptcy Code.

Second, collection of the $1,594.87 can be treated as a right created by Countrywide's pre-petition loan documents. Countrywide has properly included the escrow deficiency as of the petition date in Countrywide's Proof of Claim filed in this case. However, if it is relying on its contractual rights—rather than its subrogation rights—it has failed to include the $1,275.92[10] of pre-petition escrow deposits to which it had a contractual right. If Countrywide is relying on its contractual rights, its proof of claim should have been for the full $4,819.70 set forth above.

Accordingly, at a minimum, Countrywide's calculated increase in the escrow payment would be applied to pay the pre-petition escrow shortage that should have been included in Countrywide's proof of claim. Countrywide may not omit an amount from its Proof of Claim and then collect it from an escrow adjustment. That would violate § 362 of the Bankruptcy Code. Regardless, Countrywide may not exercise greater rights with respect to the Debtors' pre-

---

[10] As set forth above, Countrywide's mathematics assume that the May 1, 2006 escrow deposit was neither pre-petition nor post-petition. The Court does not understand the basis for this assumption. The May 1, 2006 omitted payment is the difference between the $1,594.87 and the $1,275.92, with the three cent rounding adjustment.

petition 2006 property tax obligation than those rights that the local taxing authority would be entitled to exercise.

There is no basis on which Countrywide may increase the escrow payment to pay for taxes that accrued pre-petition.

### c. *Countrywide's contractual rights in bankruptcy*

Nonetheless, Countrywide argues that the provisions of the Bankruptcy Code, Bankruptcy Local Rule ("BLR") 3015(b), the Debtors' Plan and the Chapter 13 Trustee Procedures for Administration of Home Mortgage Payments ("Trustee's Procedures") authorize Countrywide to increase the Debtors' post-petition mortgage payment to account for future escrow transactions which may include payments due to a shortage of funds, in accordance with the Security Instrument.   First, Countrywide argues that § 1322(b)(2) requires and the Plan provides that Countrywide's claim will be paid in accordance with the Security Instrument. Second, the Security Instrument authorizes Countrywide, upon notice, to require that any current escrow payments include an amount sufficient to cure any negative escrow balance.   Third, Local Rule 3015(b) requires that mortgage payments be paid through a debtor's plan by the chapter 13 trustee in accordance with the Trustee's Procedures.   The Trustee's Procedures require mortgage lenders to give written notice of any adjusted payment required on the secured claim via the plan, and absent objection, allow the trustee to disburse the adjusted amount. Based on the foregoing, Countrywide argues that: (i) because the Plan precludes the Debtors from modifying the terms of the Security Instrument and (ii) because the Security Instrument and RESPA allow Countrywide to adjust the Debtors' mortgage payments post-petition to account for any escrow shortage during the ensuing twelve-month period and (iii) because Countrywide gave the appropriate notice of such adjustment, Countrywide did not violate the automatic stay.

In reaching this determination, Countrywide ignores an important provision of the Bankruptcy Code.  While § 1322(b)(2) prohibits a debtor from modifying the rights of holders of claims secured by the debtor's principal residence, Congress provided an exception to this provision.  Section 1322(b)(5) provides that, notwithstanding § 1322(b)(2), a plan may "provide

for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment is due." 11 U.S.C. § 1322(b)(5); *see also Rake v. Wade*, 508 U.S. 464, 468-69 (1993). Section 1322(b)(5) reflects Congress' intention to afford homeowners with long-term debt the ability to cure defaults and preserve their primary asset. *In re Mendoza*, 111 F.3d 1264, 1269 (5th Cir. 1997). The Debtors' Plan recognizes the limitations and opportunities provided by § 1322(b) of the Bankruptcy Code and provides, in relevant part, that:

> The amount listed as the "principal amount of claim for arrearage" is the amount proposed by the debtor(s) in this Plan. If the actual allowed claim is in a different amount, the amount paid pursuant to this Plan shall be the amount due on the actual amount of the allowed claim without the need of an amended plan.
> …
> [C]laims held by secured creditors holding a claim secured only by a security interest in real property that is the debtor(s)' residence (other than arrearage claims set forth in the above table) and other claims treated under § 1322(b)(5) will be paid in accordance with the pre-petition contract held by the holder of the secured claim.

Although the Plan provides that secured creditors, like Countrywide, who hold a claim secured only by a security interest in the Debtors' residence will be paid according to the pre-petition contract, it further clarifies that any claims for arrearage will be treated as set forth separately in the Plan. If the arrearage claim is later determined to be allowed in an amount different than that listed in the Plan, the amount of the actual allowed claim is controlling even if no amended plan is filed.

Consequently, although the Security Instrument and RESPA authorize Countrywide to recover past-due escrow payments during the ensuing twelve-month period outside of bankruptcy, this provision is of limited consequence upon the Debtors' bankruptcy filing. Section 1322(b) requires that the Debtors cure the default in accordance with the terms of the note or cure the default pursuant to § 1322(b)(5) which provides an exception to § 1322(b)(2).

The Plan cures the default to Countrywide, including the pre-petition escrow arrearage, with payments beginning during month 10 and extending throughout the life of the 60-month Plan. Thus, the Debtors have elected to cure the default pursuant to § 1322(b)(5). This election will be effective as long as such cure is with respect to a debt for "which the last payment is due after the date on which the final payment under the plan is due" and the cure is made "within a reasonable time." 11 U.S.C. § 1322(b)(5); *see also In re Hence*, 06-32451, 2006 WL 3742186, * 4 (Bankr. S.D. Tex. Dec. 20, 2006). According to the Proof of Claim and the Plan, the first element of § 1322(b)(5) is met. Consequently, the Debtors may modify Countrywide's contractual rights with respect to the arrearage claim if the proposed cure is to be completed within a reasonable time. It is unclear what constitutes a reasonable time. The Bankruptcy Code does not define the term. The Fifth Circuit has not fully addressed the issue. *See In re Hence*, 2006 WL 3742186 at *5. Other courts to address the issue have considered each particular case and approved cure periods spanning six months to the maximum 60-month plan period. *Id.* Many of these courts have held that the determination of what constitutes a "reasonable time" is best left to the discretion of the court after a consideration of the particular circumstances of each case. *See*, *e.g.*, *In re Steinacher*, 283 B.R. 768, 774 n.13 (B.A.P. 9th Cir. 2002); *In re Gillis*, 333 B.R. 1, 10 (Bankr. D. Mass. 2005). The courts consider various factors to determine whether a particular cure period is reasonable.[11]

---

[11] Such factors include: (1) the nature and repayment period of the original obligation, (2) the nature of the property held as security, (3) debtors' payment record, (4) the amount and reason for the arrearage, (5) the availability of the debtors' discretionary income to cure the default, (6) the ability of the debtors to meet the obligations of their plan and to continue current payments on their installment obligations, (7) whether the debtors are putting forth their best effort to cure the default, and (8) the necessity of the asset to an effective rehabilitation of the debtors. *In re Chavez*, 117 B.R. 730, 732 (Bankr. S.D. Fla. 1990).

It is not necessary for this Court to determine whether the cure period set forth in the Plan qualifies as a "reasonable time."[12]  The Court confirmed the Debtors' Plan, which set forth the cure period, on June 27, 2006.  A final confirmation order is res judicata as to all justiciable issues which were or could have been decided at the confirmation hearing.  *See* 11 U.S.C. § 1327(a); 8 COLLIER ON BANKRUPTCY ¶ 1327.02[1] (15th ed. rev. 2006); *In re Layo*, 460 F.3d 289, 293 (2d Cir. 2006); *In re McDonald*, 336 B.R. 380, 385 (Bankr. N.D. Ill. 2006).  Implicit in the Court's June 27, 2006 order was a determination that the proposed cure period was a "reasonable time."  Countrywide could have contested the proposed plan by filing an objection. No objection was filed.  Because the confirmation order was not appealed, it is a final order with res judicata effect.  *See, e.g., Eubanks v. F.D.I.C.*, 977 F.2d 166, 169 (5th Cir. 1992). Accordingly, Countrywide's claim for the pre-petition escrow shortage shall be paid in accordance with the Debtors' Plan pursuant to § 1322(b)(5) and not according to the pre-petition contract.

Nonetheless, the Court recognizes the difficulties that are posed by the post-petition escrow payments.  Pursuant to the Security Instrument, each post-petition escrow payment in the amount of $318.98 includes an amount equal to 1/12 the Debtors' 2006 property tax obligation. If the mortgage lender pays a debtor's tax obligation pursuant to the loan documents and the automatic stay requires that the mortgage lender treat the entire 2006 property tax claim as a pre-petition debt, the debtor benefits while the mortgage lender must bear the burden and await

---

[12] Even if it were determined that the Debtors' proposal did not comply with § 1322(b)(5) because the cure period was not reasonable, and therefore the pre-petition contract governs the Debtors rights to cure the default pursuant to § 1322(b)(2), Countrywide would still be prohibited from acting to collect this pre-petition debt post-petition. Although a claim that is secured only by a security interest in a debtor's principal residence may not be modified, the holder of such a claim is nonetheless stayed from the collection of its claim.  8 COLLIER ON BANKRUPTCY ¶ 1322.06[1][a] (15th ed. rev. 2006).

reimbursement over the life of the debtor's plan, generally 60 months.  Countrywide argues that this affords the Debtors a windfall.

To decide the appropriate outcome of this dispute, the Court must reconcile the competing language of and purposes behind § 362(a), § 1322(b)(2) and § 1322(b)(5) of the Bankruptcy Code.  Both § 1322(b)(2) and § 1322(b)(5) provide a mechanism for the payment through a chapter 13 plan of pre-petition claims.  Put simply, payment of the pre-petition claims is not barred by § 362(a).  Instead, any attempt to collect the claims outside of the plan process is what is prohibited.

How should § 1322(b)(2) and § 1322(b)(5) be reconciled with respect to the payment of pre-petition property taxes, payment of which was not due to the governmental unit holding the claim until after the petition date?  The key is found in § 1322(b)(5).  That section provides that a debtor's chapter 13 plan may provide for the "curing of any default" while providing for the "maintenance of any payments."  11 U.S.C. § 1322(b)(5).

In this case, the Debtors were in default for both the pre-petition Escrow Deficit *and* for failing to make pre-petition escrow payments.  The sum of these amounts is the Contractual Escrow Shortage.  Pursuant to § 1322(b)(5), all of these amounts may be cured.  Because the 2006 property tax debt is a pre-petition debt, the Debtors argue they should be allowed to cure the entire debt throughout the life of the Plan.  The Court recognizes that this arrangement creates a possible short-term windfall for the Debtors because their monthly escrow would drop for a short while because there would be no need to reserve for payment of the taxes.  It is unrealistic to believe that such a short term windfall is consistent with the purposes of § 1322(b)(5).  This is especially true when the Court considers that the language of § 1322(b)(5) addresses curing of defaults and maintenance of payments.  It is purely forward looking.

Section 1322(b)(5) does not give the debtor a right to defer payment on any debt that is a pre-petition debt. The home mortgage itself is a pre-petition debt, but the debtor must maintain regular payments on that debt. Just as the Debtors read too much into § 1322(b)(5), Countrywide reads too much into § 1322(b)(2) and too little into § 1322(b)(5). Section 1322(b)(5) simply does not allow a debtor to reduce his regular escrow payment by declaring that the pre-petition property taxes need not be paid at all.

Taken as a whole, the Court reads § 362(a), § 1322(a)(2) and § 1322(a)(5) to be properly reconciled as follows:

1.    A debtor's pre-petition escrow deposit obligation may be cured under § 1322(a)(5).

2.    The lender may, but is not obligated, to pay pre-petition taxes that are due post-petition.

3.    A debtor's post-petition escrow obligation is not modified because of § 1322(b)(5), but may not be adjusted upward based on the debtor's failure to make pre-petition escrow deposits.

4.    The lender's proof of claim may properly include any pre-petition contractual shortfall in the escrow account. If the lender includes this amount in its proof of claim, (i) it may be cured under a chapter 13 plan; and (ii) the amount set forth in the proof of claim must be credited to the debtor's escrow account. If the lender does not include the amount in its proof of claim, then the debtor may pay the property taxes over the period allowed by § 1322(a)(2), with the lender making appropriate partial payments via disbursements out of the escrow account for payments collected by the lender prior to the date on which the post-petition tax payment was due.

This procedure appears to best reconcile the competing positions. If followed, then holders of home mortgages will not be made worse off by the filing of the bankruptcy petition. All regular post-petition payments will be made. To the extent that the lien was subordinated to property taxes at the commencement of the case, that matter will be addressed over the life of the plan. The debtor will not be worse off either. The amount of property taxes may be paid over

time to the home mortgage lender (if there is an escrow) or over time to the taxing authority if there is no escrow.

By allowing the pre-petition Contractual Escrow Shortage to be cured while requiring maintenance of current payments (without adjustment based on the pre-petition default), the Court best reconciles the competing interests protected by the statute.

### d. The automatic stay

The automatic stay bars Countrywide from the continuation of any action against the Debtors to recover the pre-petition claim and from acting to obtain or enforce a lien against property of the estate, which includes the Debtors' post-petition income.  11 U.S.C. § 362(a)(1), (3) and (4); § 1306(a)(2).  Similarly, § 362(a)(5) and (6) bar Countrywide from taking any act to enforce against the Debtors' property any lien that secures a claim that arose pre-petition or to collect a claim against the Debtors that arose before the bankruptcy filing.  *Id*. at § 362(a)(5) and (6).

Countrywide violated the automatic stay.  It is undisputed that in February 2005, the Debtors' regular monthly mortgage payment was $987.07.  After the Debtors filed bankruptcy, Countrywide reanalyzed the mortgage loan.  Countrywide calculated the pre-petition Escrow Deficit to be $3,543.78 and included this amount as the arrearage amount in the Proof of Claim. This amount did not include any amount for the 2006 property tax obligation, a pre-petition debt. Countrywide then recalculated the monthly mortgage payment in accordance with the Loan Documents to include an amount due for the Debtors' regular escrow contribution.  To the extent that Countrywide increased the Debtors' mortgage payment post-petition to provide for the pre-petition Contractual Escrow Shortage, Countrywide attempted to collect and enforce a pre-petition debt against the Debtors and property of the estate post-petition in violation of the

automatic stay.  The Plaintiff has demonstrated that there are no issues of material fact with respect to whether Countrywide violated the automatic stay.  Accordingly, summary judgment is appropriate with respect to this issue.

### e. Countrywide's claim for inspection fees and attorneys fees

The Debtors also seek a determination on summary judgment that Countrywide is not entitled to recover post-petition inspection fees and attorneys fees (the "Fees"), or alternatively that Countrywide violated the automatic stay when it sought to collect the Fees.  Countrywide argues that it is entitled to collect the Fees pursuant to the Loan Documents and § 506(b).  Countrywide argues that because paragraph 9 of the Security Instrument authorizes Countrywide to charge the Debtors any amount necessary to protect its interest in the Property, it is entitled to recover the Fees which were incurred in order to prepare and file the Proof of Claim in this case.

As set forth above, paragraph 9 of the Security Instrument authorizes Countrywide to take any action and to pay for whatever is reasonable to protect its interest in the Property, including "assessing the value of the Property" and "paying reasonable attorneys' fees to protect its interest in the Property and/or rights under the Security Instrument, including its secured position in a bankruptcy proceeding."  Consequently, the Loan Documents grant Countrywide the authority to charge the Fees against the Debtors' mortgage loan.  Nonetheless, it must still be determined whether Countrywide is entitled to recover such Fees, which were incurred by Countrywide post-petition, subsequent to the Debtors' bankruptcy filing.

Section 506(b) generally governs the allowance of post-petition interest, fees, costs and charges as part of a secured claim and provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under [§ 506(c)], is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such

claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).  Section 506(b) allows post-petition charges only if a claim is oversecured. If the claim is oversecured, § 506(b) authorizes payment of interest.  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).  Recovery of certain fees, costs and charges, however, is only allowed if they are reasonable.  *Id.*

The application of § 506(b) to a claim secured only by a security interest in real property that is the debtor's principal residence may conflict with § 1322(b)(2).  Application of § 506(b) to a claim held by a secured creditor that is undersecured would limit the creditor's recovery of fees, costs, and charges to the value of the collateral securing the claim, despite any provision in the agreement between the parties that allows such claims.  Such a result might conflict with § 1322(b)(2) which prohibits the modification of a claim secured only by the debtor's principal residence.  11 U.S.C. § 1322(b)(2).  Where two statutes conflict, a more specific statute takes precedence over a more general statute.  *In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 548 (5th Cir. 2002) (citing *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961)).  Consequently, the more specific provision within chapter 13 prevails over the general provision of § 506(b).  This result is consistent with the apparent intent of Congress, in enacting § 1322(b)(2), that the contract between the parties govern the amounts due should the debtor file bankruptcy.  Accordingly, Countrywide may be entitled to collect the inspection fees incurred in assessing the value of the Property and reasonable attorneys fees incurred in filing the Proof of Claim pursuant to the contract.  Indeed, the Home Mortgage Payment Procedures adopted by this Court on September 29, 2005, explicitly allow for the method of imposing and collecting charges such as these.  *See* Home Mortgage Payment Procedures adopted by the Southern District of Texas on September 29, 2005, at ¶¶ 3, 9 and 10.  The Home Mortgage Payment Procedures are

incorporated into the Debtors' confirmed plan and into BLR 3015(b). Accordingly, the post-petition fees and charges do not violate the automatic stay.

However, whether the Fees are allowed must be determined under state law.  Texas law governs whether the Fees charged pursuant to the agreement are reasonable.  Reasonableness of attorneys fees is a question of fact and must be supported by competent evidence.  *See*, *e.g.*, *Manon v. Tejas Toyota, Inc.*, 162 S.W.3d 743, 751-52 (Tex. App.—Houston [14th Dist.] 2005, no pet.)  Factors that may be considered in determining the reasonableness of attorneys fees include: (1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *Arthur Andersen & Co. v. Perry Equip. Co.*, 945 S.W.2d 812, 818 (Tex. 1997); *Academy Corp. v. Interior Buildout & Turnkey Constr., Inc.*, 21 S.W.3d 732, 742 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see also In re Valdez*, 324 B.R. 296, 300 (Bankr. S.D. Tex. 2005) (in the context of § 506(b), whether fees and costs are reasonable requires a determination that the creditor's action that resulted in such fees was of a kind that similarly situated creditors might reasonably conclude should be taken).

Accordingly, a trial is required to determine whether the Fees imposed in this case are allowed under Texas law.  If the challenged Fees are allowed, the Debtors have agreed to pay those fees and expenses as part of the confirmed plan and as required by the Bankruptcy Code.

See § 1322(b)(2).  If a discharge is to be issued in this case, the Court will also determine the total amount then due to Countrywide.  This amount will include any unpaid reasonable fees and expenses charged by Countrywide.  *See* Home Mortgage Payment Procedures, at ¶¶ 3, 9 and 10.

## 2.  *Did Countrywide willfully violate the automatic stay?*

As set forth above, the Court finds that Countrywide violated the automatic stay when it acted to collect and enforce a pre-petition debt against the Debtors and property of the estate post-petition.

Section 362(k)(1) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(k)(1).[13]  A willful violation does not require a specific intent to violate the stay; instead, damages may be awarded upon a finding that (1) the defendant knew of the automatic stay and (2) that the defendant's actions that violated the stay were intentional.  *In re Chesnut*, 422 F.3d at 302.  Thus, the term willful refers to the creditor's knowledge of the stay, so that any deliberate act taken against the debtor or the property of the estate after the creditor knows that the debtor filed bankruptcy is deemed willful.  "Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was 'willful' or whether compensation must be awarded."  *Id.*  Once a creditor knows of the existence of the automatic stay, the creditor bears the risk of all intentional acts that violate the stay.  Nonetheless, a creditor's good faith may be considered in assessing damages for violation of the stay.  *See, e.g., In re Campion*, 294 B.R. 313, 318 (B.A.P. 9th Cir. 2003).

---

[13] Section 362(k)(2) limits the damages available under § 362(k)(1) to actual damages if the defendant's actions which violated the stay were taken in the good faith belief that § 362(h) applied to the debtor.  11 U.S.C. § 362(k). Section 362(h) provides for the termination of the stay as to certain personal property if the debtor has not timely filed and acted upon a statement of intention regarding the personal property.  11 U.S.C. § 362(h).  Because only real property is involved in this proceeding, § 362(k)(2) is inapplicable.

Countrywide knew of the Debtors' bankruptcy filing.  Countrywide is included on the creditor mailing matrix filed by the Debtors.  On April 10, 2006, Countrywide, through Barrett, Burke, Wilson, Castle, Daffin & Frappier, L.L.P., filed a notice of appearance and request for notice.  In addition, Countrywide's filing of the Proof of Claim, in which it attempts to charge the Debtors' for the negative escrow account balance, itself demonstrates that Countrywide knew of the Debtors' bankruptcy.  Countrywide has offered nothing to the contrary.  Consequently, the Court finds that Countrywide knew of the automatic stay.

Moreover, Countrywide's actions were intentional.  In its Proof of Claim, Countrywide notified the Debtors that it would increase the Debtors' monthly mortgage payment effective June 1, 2006.  The affidavit testimony submitted by Countrywide shows that Countrywide intentionally recalculated the Debtors' accumulated negative escrow account on the petition date and intentionally increased the monthly payments pursuant to Countrywide's rights set forth in the Loan Documents.  Although Countrywide may recover the pre-petition escrow amounts as an arrearage claim included within the Proof of Claim, the Court had not granted Countrywide relief from the automatic stay to collect the amount by way of increased monthly payments.  Accordingly, the Court finds that Countrywide willfully violated the automatic stay and that damages must be awarded pursuant to § 362(k).

Section 362(k) provides that a debtor injured by a creditor's willful violation of the automatic stay "shall recover actual damages, including costs and attorney's fees."  11 U.S.C. § 362(k).  The inclusion of the words "shall recover" indicates that Congress intended that the award of actual damages, costs and attorneys fees be mandatory upon a finding that a defendant willfully violated the stay.  *See*, *e.g.*, *In re Walsh*, 219 B.R. 873, 876 (B.A.P. 9th Cir. 1998); *Tom v. Countrywide Home Loans, Inc. (In re Tom)*, No. 05-1232 (S.D. Tex. June 2, 2005).  Thus,

upon a finding that there was a willful violation of the automatic stay, the violator must compensate a debtor for his actual damages and costs.

Countrywide argues, however, that because the Debtors were already obligated to pay their real property taxes, they have suffered no damages from the increased monthly mortgage escrow payments that simply compensate Countrywide for paying the taxes as due by the Debtors.  It is true that the local taxing authority would hold a tax lien against the Property had Countrywide not paid the taxes.  However, if the taxing authority had retained its claim, the Debtors would have been able to repay the amount over the term of their plan.  Countrywide seeks to impose payment over a twelve-month escrow recovery period, a period that conflicts with the confirmed plan and that is shorter than the period that is authorized for repayment of tax claims under the Bankruptcy Code.

Countrywide willfully violated the stay and § 362(k)(1) mandates that the Debtors recover actual damages.  "The plain meaning of [§ 362(k)] requires that the injured party be awarded the entire amount of actual damages reasonably incurred as a result of a violation of the automatic stay."  *In re Walsh*, 219 B.R. at 878.  Actual damages include costs and attorneys fees. *Id.*, *see also Mitchell v. BankIllinois*, 316 B.R. 891, 904 (S.D. Tex. 2004) ("Clearly, fees and costs experienced by the injured party in resisting the violator's appeal are part of the damages resulting directly from the stay violation.").  Consequently, where a creditor has willfully violated the automatic stay, the Court has no discretion as to whether reasonable attorneys fees should be awarded.  *See*, *e.g.*, *In re Schafer*, 315 B.R. 765, 775 (Bankr. D. Colo. 2004); *In re Smith*, 296 B.R. 46, 55 (Bankr. M.D. Ala. 2003).

Nonetheless, attorneys fees must be reasonable and necessary.  *See*, *e.g.*, *In re Robinson*, 228 B.R. 75, 86 (Bankr. E.D.N.Y. 1998).  Where a plaintiff incurs unnecessary litigation costs a court may reduce an award of attorneys fees.  *Id*.

Although § 362(k)(1) further provides that an award of punitive damages is within the discretion of the court in appropriate circumstances, such damages are generally limited to situations where a creditor has acted in bad faith or with a reckless disregard for the law or rights of others.  *See*, *e.g.*, *Nissan Motor Acceptance Corp. v. Baker*, 239 B.R. 484, 490 (Bankr. N.D. Tex. 1999).  Although the Court questions whether the evidence will support punitive damages, a trial is required on this issue.  In addition, a trial is required on the amount of any actual damages incurred.

## Conclusion

For the reasons set forth above, the Court finds that Countrywide willfully violated the stay when it increased the Debtors' monthly mortgage escrow payment.  Accordingly, the Plaintiffs' motion for summary judgment is granted in part.

Signed at Houston, Texas, on March 16, 2007.

MARVIN ISGUR
United States Bankruptcy Judge